IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                        Criminal Case No.: 1:24-CR-1
                                        (JUDGE KLEEH)

SHANNON D. HEBB,

        **Defendant.**

## REPORT AND RECOMMENDATION RECOMMENDING THAT DEFENDANT'S MOTION TO SUPPRESS PHSYICAL EVIDENCE [ECF NO. 20] BE DENIED

Pending before the undersigned Magistrate Judge is a motion to suppress physical evidence [ECF No. 20] filed by Defendant Shannon D. Hebb ("Defendant") on February 8, 2024. By Referral Order dated February 8, 2024 [ECF No. 21], the Hon. Thomas S. Kleeh, Chief United States District Judge, referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The Court also is in receipt of the Government's response [ECF No. 25] in opposition to Defendant's motion, filed on February 16, 2024. [ECF No. 25]. The undersigned conducted a hearing on Defendant's motion on March 1, 2024, at which the Court heard witness testimony and accepted exhibits into evidence.

Based on a detailed review of Defendant's motion [ECF No. 20], the Government's response [ECF No. 25], the exhibit introduced into evidence at the hearing on Defendant's motion, the testimony given by witnesses at said hearing, and pertinent legal authority, the undersigned **RECOMMENDS** that Defendant's motion be **DENIED** as set forth herein.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant stands accused in a two-count indictment which a Grand Jury returned against him on January 3, 2024. [ECF No. 1]. Defendant is named in the Indictment with the offenses of

1

(1) Possession with Intent to Distribute 50 Grams or More of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii), as charged in Count One, and (2) Unlawful Possession of a Firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2), as charged in Count Two.

Defendant was detained and arrested on September 23, 2020 by Sgt.[1] Jason Brewer ("Brewer") of the West Virginia State Police ("WVSP"). Brewer had received a "BOLO" (be-on-the-lookout) notice from dispatch about a motorcycle traveling at a very high rate of speed. Brewer saw the motorcycle, which was driven by an individual later identified as Defendant. After Brewer chased Defendant, Defendant eventually wrecked the motorcycle and ran into nearby woods. Brewer ultimately subdued and detained Defendant. When Brewer patted down Defendant, he located a bag of presumed methamphetamine (giving rise to the charge in Count One herein, which is <u>not</u> a subject of Defendant's motion to suppress). Brewer also opened Defendant's backpack and found a firearm, a 9 mm pistol (giving rise to the charge in Count Two herein, which <u>is</u> the subject of Defendant's motion to suppress).

Defendant challenges the propriety of the warrantless search of the backpack and resulting discovery of the firearm. The Government argues that the warrantless search of the backpack was lawful, such that the evidence (namely, the firearm) was properly obtained and can be used against Defendant.

## II. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

During the aforementioned suppression hearing on March 1, 2024, the Court heard sworn testimony from two witnesses, namely, (1) Brewer, and (2) Defendant himself. The Court also received into evidence the following:

---

[1] At the time of events giving rise to the Indictment, Brewer held the rank of corporal. He since has been promoted to the rank of sergeant.

1. Government's Exhibit 1 [ECF No. 34-1], WVSP Form 17A, being an inventory of Defendant's belongings upon arrest.

### A. Brewer's Testimony

The Government called Brewer to testify. According to his testimony,[2] Brewer has been an officer with WVSP for nearly 20 years. [1:17:18 to 1:17:21]. On September 23, 2020, Brewer stated, he was at his office when he received a BOLO about a motorcycle traveling at excessive speed and weaving through traffic. [1:17:45 to 1:18:00]. Brewer left his office and drove to U.S. Route 50[3], driving eastbound. [1:18:02 to 1:18:13]. This stretch of highway is located in Doddridge County, in the Northern District of West Virginia. [1:18:55 to 1:18:59]. He drove approximately two miles and saw the motorcycle, which was traveling westbound. [1:18:14 to 1:19:08]. Brewer determined that the motorcycle was traveling "way over" a speed of 120 miles per hour. Id. Brewer ultimately determined that the driver of the motorcycle was Defendant. [1:18:25 to 1:18:43].

Brewer described the motorcycle as a "crotch rocket" style of motorcycle, meaning that it was capable to being operated at especially high rates of speed. [1:19:08 to 1:19:10]. Brewer turned to pursue the motorcycle, which was "a good distance" ahead. [1:19:11 to 1:19:19]. The motorcycle turned left at a traffic light, onto Sunnyside Road, a secondary road. [1:19:20 to 1:19:26]. Brewer had activated the lights and siren on his police vehicle. [1:19:27 to 1:19:30]. Brewer then followed the motorcycle up Leeson Run Road from Sunnyside Road, losing sight of the motorcycle for a time. [1:19:31 to 1:19:37]. Brewer eventually caught up to the motorcycle on Leeson Run Road. [1:19:40 to 1:19:46]. Brewer noted that it took effort to catch up to the

---

[2] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on March 1, 2024, which is located on the section of the Court's intranet site for FTR recordings.
[3] The undersigned takes judicial notice of the fact that the segment of U.S. Route 50 about which Brewer testified is a wide, four-lane corridor, often with a median dividing the eastbound and westbound routes.

motorcycle because Defendant is "very good" at operating a motorcycle. [1:19:47 to 1:19:48]. Eventually, Defendant crashed the motorcycle in a turn. [1:20:03 to 1:20:10]. The road on which Defendant crashed had a surface of dirt and gravel. Id. After crashing, Defendant ran to a nearby wooded area. [1:20:11 to 1:20:12].

Brewer immediately exited his police vehicle and ran after Defendant. [1:20:13 to 1:20:16]. Brewer and Defendant reached a distance of 100 to 150 yards into the woods, when Brewer caught up to Defendant. [1:20:20 to 1:20:30]. Defendant turned around towards Brewer and began to back up. [1:20:31 to 1:20:34]. Brewer could see Defendant's hands, and determined Defendant had no weapons in his hands. [1:20:35 to 1:20:36]. Brewer pulled out his taser and told Defendant to get on the ground. [1:20:37 to 1:20:40]. Defendant said words to the effect that he did not want Brewer to shoot him, and Brewer kept telling Defendant to get on the ground. [1:20:41 to 1:20:48]. In these moments, the two were ascending a small incline, with Defendant walking backwards. [1:20:50 to 1:20:58].

Defendant would not get on the ground, so Brewer deployed the first of his taser probes. [1:20:59 to 1:21:05]. Brewer believes that this first deployment of the taser did not result in a good connection, because Defendant did not seem to be affected by it. [1:21:06 to 1:21:10]. Defendant continued to back up and continued to be non-compliant with Brewer's demands to get on the ground, and then approached a log. [1:21:12 to 1:21:15]. Brewer deployed the taser a second time, and apparently made better contact with Defendant, because Defendant fell to his back, over the log. [1:21:16 to 1:21:21]. Brewer approached Defendant, and used a function of the taser that allowed Brewer to deploy a lesser jolt of electricity. [1:21:22 to 1:21:39]. Brewer commanded Defendant to remain on the ground, to which Defendant stated "yes, sir." Id.

While on the ground, Defendant got on his stomach. [1:21:40 to 1:21:43]. Defendant was wearing a backpack. Id. Brewer explained that Defendant is a large person, and that he recalled having to use two sets of handcuffs on Defendant. [1:21:44 to 1:21:53].[4] The use of two sets of handcuffs was particularly necessary given that Defendant was wearing the backpack as well as a thick coat that is worn during operation of a motorcycle. [1:23:51 to 1:24:01]. Brewer stated that he rolled Defendant onto Defendant's side and patted him down. [1:21:54 to 1:22:09]. Brewer then rolled Defendant to his other side and felt a bulge in Defendant's pocket. [1:22:10 to 1:22:12]. The item causing the bulge was a large bag of suspected methamphetamine. [1:22:13 to 1:22:21]. At the time he discovered the methamphetamine, Brewer estimated the volume of it to be 50 grams or more. [1:24:30 to 1:24:35]. The bag of suspected methamphetamine was in Defendant's right pocket. [1:22:22 to 1:22:29]. In another pocket, Brewer found a pipe and a handful of currency. [1:22:30 to 1:22:35].

As for the backpack Defendant was wearing, Brewer testified that he unzipped the backpack and located a firearm. [1:22:36 to 1:22:44]. Because Brewer was in this location by himself with Defendant, he did not want to uncuff Defendant to remove the backpack. [1:22:45 to 1:22:51]. Brewer set the firearm from the backpack to the side, out of Defendant's reach. [1:22:52 to 1:22:56]. Some minutes later (Brewer could not recall exactly how long), another officer from WVSP arrived on the scene to assist Brewer. [1:22:58 to 1:23:16]. When the other officer arrived, the two officers removed the taser probes from Defendant, secured the scene, and walked Defendant out of the wooded area. [1:23:17 to 1:23:20].

---

[4] In using two sets of handcuffs, Brewer explained that a set of handcuffs is placed on each wrist of an arrestee, and then the two sets of handcuffs are locked together at the unused wrist restraints on each, creating greater length of hardware behind the arrestee's back. [1:23:30 to 1:23:50]. This creates less strain on the shoulders of larger arrestees. Id.

5

At the time he searched the backpack, Brewer testified, Defendant had committed the crime of fleeing with reckless indifference, and had possessed the illegal methamphetamine in his pocket. [1:24:02 to 1:24:17]. When Brewer searched Defendant's pockets, it was incident to the arrest of Defendant, to determine whether Defendant had anything that might be dangerous to himself or officers. [1:25:00 to 1:25:08]. Brewer testified that he searched the backpack while Defendant still was wearing it. [1:25:09 to 1:25:12]. He searched the backpack because he had, moments before, concluded a high-speed chase of Defendant, and Brewer surmised that Defendant was running for some nefarious reason. [1:25:13 to 1:25:25].

When Brewer recovered the firearm from the backpack, it was loaded; Brewer could not recall with certainty whether there was a round in the chamber. [1:25:26 to 1:26:00]. To Brewer, leaving the backpack unsearched was an unacceptable risk, insofar as there could have some grave risk (even if only a slight one, while handcuffed) that Defendant could access the backpack and thus the firearm within it. [1:26:05 to 1:27:17]. By Defendant possessing the firearm (along with the currency and the large quantity of methamphetamine), Brewer viewed that as Defendant having a willingness to use the firearm for his own protection. Id.

Brewer estimated that at the time he detained Defendant in the woods, he was approximately 100 yards from his police vehicle. [1:27:29 to 1:27:35].

After Defendant's arrest, Brewer took Defendant's belongings (including the backpack) to his office and logged those items into evidence. [1:27:58 to 1:28:04]. Per WVSP procedure, this involved drafting an evidence log, tagging the items, and placing the items in an evidence storage area for eventual inventory. [1:28:05 to 1:28:18]. This resulted in the creation of the document entered into evidence as Government's Exhibit 1, the inventory of Defendant's belongings at the time of his arrest. [1:28:26 to 1:30:37].

Brewer further testified as to safety concerns which arise from transporting items in his police vehicle. [1:30:55 to 1:31:50]. For example, he explained that certain controlled substances can be dangerous to handle, and he would want to account for anything which could pose a hazard. Id. Brewer stated that if he had been required to obtain a search warrant for the backpack, he would have done so, as he would wish to be compliant with any such requirement. [1:32:50 to 1:33:20]. And Brewer noted that he discovered the firearm in the backpack after he had discovered the currency and drugs/paraphernalia on Defendant. [1:33:22 to 1:22:26].

On cross-examination, when asked when the backpack was removed from Defendant's person, Brewer was candid that his recollection of the details was not the greatest on this point, given the passage of time. [1:34:20 to 1:34:43]. But Brewer was clear that the backpack was removed from Defendant's person at the scene of arrest. Id. He believed that it was done so once the other trooper arrived at the scene. Id. And he noted that the officers did not have body cameras at that time. Id.

Further, on cross-examination, Brewer agreed with Defendant's counsel that Defendant likely would have to have been un-handcuffed to remove the backpack. [1:34:50 to 1:35:16]. But Brewer reiterated that Defendant was wearing the backpack at the time Brewer searched it and located the firearm. Id. Brewer went on to explain that, to the best of his recollection, he waited for the other trooper to arrive, given Defendant's physical size and strength, before un-handcuffing him to effectuate removal of the backpack. [1:35:18 to 1:35:54]. Brewer stated that Defendant may have been able to overpower him, had Brewer lacked equipment such as the taser. Id. Brewer said that, given his experience as an officer, he knows his limitations, and was concerned about Defendant's physical strength. Id. And Brewer acknowledged that once Defendant was subdued by the taser, he was not resistant to Brewer, and was complaint with Brewer's commands. [1:37:20

7

to 1:37:38]. Brewer had control of Defendant at that point, and was able to handcuff Defendant by himself. Id. Other than using the taser, Brewer had to exert no force on Defendant to subdue him and render him compliant. [1:37:50 to 1:38:10].

On re-direct examination, Brewer stated that, while he has not conducted specific experiments, it would be possible to loosen backpack straps in such a way as to allow a backpack to slide down the arms of the person wearing it. [1:38:40 to 1:38:55].

### B. Defendant's Testimony

Defendant testified on his own behalf. Defendant testified regarding the events in the wooded area during his encounter with Brewer. Defendant stated that when Brewer deployed the taser on him, Defendant was standing at the top of an embankment facing Brewer, with hands raised. [1:50:14 to 1:50:30]. Defendant stated that he was surrendering. [1:15:32 to 1:50:39]. Defendant said that he could not recall how many times he was tased, but in the course of being tased, he fell to the ground. [1:50:41 to 1:50:53]. Defendant explained that the experience of being tased was such that he surrendered to Brewer and did not resist or flee at that point. [1:50:55 to 1:51:24].

Defendant's version of the handling of the backpack is different from Brewer's. Defendant testified that Brewer stood him up after he was on the ground. [1:51:30 to 1:52:14]. Defendant recalled that Brewer could not handcuff him immediately because of the bulk of Defendant's thick motorcycle jacket and backpack over top of the jacket. Id. Thus, Defendant recalled, Brewer had him remove the backpack and jacket before handcuffing him. Id. Defendant complied with this process of being handcuffed because Brewer threatened to tase him again if he did not comply. Id.

Per Defendant's testimony, he and Brewer were face to face when Brewer searched the backpack. [1:52:15 to 1:52:52]. Defendant was standing before Brewer in handcuffs when Brewer

8

searched the backpack. Id. In other words, Defendant testified, he was not wearing the backpack when Brewer searched it. Id. Defendant stated that he recalled this sequence of events as explained to the Court, even though (a) the events were some years in the past, (b) the taser had affected him such that he could not be accepted into the jail immediately because his heart rate was too high. [1:52:54 to 1:53:14].

On cross-examination, Defendant acknowledged that he has three or four felony convictions.

## III. LEGAL ISSUES AND ANALYSIS

Defendant's only contention is that the warrantless search of the backpack was improper, given recent developments in Fourth Circuit jurisprudence regarding warrantless searches of backpacks.

### A. Legal Principles

As a foundational matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Moreover, "the general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." Michigan v. Summers, 452 U.S. 692, 700 (1981).

A warrantless arrest and search incident to such arrest are permissible where there is probable cause that crime has been, is being, or will be committed. U.S. v. Dickey-Bey, 393 F.3d 449, 453 (4th Cir. 2004). "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing,

9

or is about to commit an offense." Id. (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). "Probable cause is judged by an analysis of the totality of the circumstances . . . which are weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Under this pragmatic, common sense approach, we defer to the expertise and experience of law enforcement officers at the scene." Id. (citations and quotations omitted).

As for automobile stops, it is clear that they are a "seizure" under the Fourth Amendment. U.S. v. Sowards, 690 F.3d 583, 587-588 (4th Cir. 2012).

Moreover, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). It is the Government's burden to demonstrate that one of these exceptions applies. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971). Among those few exceptions to the requirement to obtain a warrant is the circumstance where the search of a person is incident to an arrest of that person. "[A] police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area within his immediate control." Davis v. United States, 564 U.S. 229, 232 (2011) (citation and quotation omitted). The policy behind this exception is to remove any weapons an arrestee may possess and to secure evidence. United States v. Davis, 997 F.3d 191, 195 (4th Cir. 2021). However, relevant to the facts of the instant matter, the Fourth Circuit has held "that police officers can conduct warrantless searches of non-vehicular containers 'only when the arrestee is unsecured and within reaching distance of the [container] at the time of the search.'" Id., at 197 (quoting Arizona v. Gant, 556 U.S. 332, 343 (2009)).

10

It is the Government's burden, by a preponderance of the evidence, to establish the admissibility of evidence seized without a search warrant. United States v. Small, 944 F.3d 490, 502 (4th Cir. 2019).

Finally, a well-established principle is that of the exclusionary rule. This rule holds that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### C. Arguments of Counsel at Motion Hearing

As discussed with counsel at the conclusion of testimony at the Motion Hearing, the Court must make a factual determination about whether Defendant was or was not wearing the backpack at the time Brewer searched it. Brewer testified that Defendant was wearing it, while Defendant testified that he was not. Whether Defendant was wearing it at the time of the search is a crucial determination under Fourth Circuit jurisprudence, especially Davis, 997 F.3d 191.

At the conclusion of the testimony, the undersigned clarified with Defendant's counsel that the principal authority which Defendant believes to be most helpful to the Court here is Davis. Defendant's counsel stressed that, factually, Defendant could not have removed the backpack from his back if his hands were handcuffed behind his back, thus obviating any concern about Defendant accessing the backpack to obtain something dangerous during the arrest. But more to the point, Defendant's counsel emphasized that the more likely factual scenario was that Brewer facilitated removal of the backpack before being able to handcuff Defendant effectively. Defendant's counsel also noted that Davis was decided after the events herein, so Brewer would not have known to treat the warrantless search of a backpack differently. And as to the specific circumstances here

11

(and the potential risk to Brewer in the course of an arrest of Defendant), Defendant's counsel acknowledged Defendant's physical size and strength, while also stressing that Defendant ultimately was compliant to Brewer's commands.

The Government's counsel stated that the Government relies on both Davis and United States v. Ferebee, 957 F.3d 406 (4th Cir. 2020). The Government argued that the law established in these two decisions is the same, and that the difference between the two cases is in their facts, not the resulting black letter law. Per the Government, the Fourth Circuit in these two cases distinguished, factually, as to whether the police officers reasonably believed that the arrestees in the respective circumstances could access dangerous objects such that the warrantless searches of backpacks were justified. In the instant matter, the Government stressed that Brewer's testimony about the placement of the backpack is that Defendant was wearing it when Brewer searched it. As such, the Government's argument goes, the backpack essentially was part of Brewer's person. The facts of the instant case are different from both Davis and Ferebee because Defendant was wearing the backpack at the time of the search (at least insofar as Brewer testified; Defendant disagrees that he was wearing it during the search). Thus, the Government's argument goes, the warrantless search, being incident to arrest, was lawful – just as, say, a warrantless search of his pockets would be permissible if conducted incident to arrest.

### D. Analysis

In the case at bar, the necessary sequential analysis is as follows. The first issue is whether there was probable cause to initiate the traffic stop of Defendant on the motorcycle and perform the subsequent arrest. The second issue, then, is whether the resulting warrantless search of the backpack was lawful.

As to the first issue, there appears to be no dispute between the parties that Brewer had probable cause to initiate the stop of Defendant when he was operating the motorcycle. There is no dispute that Defendant was travelling at an excessive rate of speed and then led Brewer on a high speed chase. Indeed, the high speed chase came to a stop only after Defendant wrecked the motorcycle. There also is no factual dispute that Defendant then fled by foot into a remote, wooded area, and had to be subdued by a taser in order for Brewer to effectuate a detention and arrest. Thus, the undersigned **FINDS** that the stop of the automobile (motorcycle) was proper, as was the arrest.

As to the second issue, then, the parties indeed dispute whether Brewer's warrantless search of Defendant's backpack incident to arrest (yielding the firearm) was lawful.[5] Defendant seems to put forward a two-pronged argument: (1) in his version of the facts, he was not wearing the backpack during the search, such that the backpack was separate from his person and a warrant was required to search it, and (2) even if he was wearing the backpack during the search, he could not have accessed it because he was handcuffed, and as such, the backpack was off-limits for a warrantless search. For its part, the Government stresses Brewer's version of the facts (that Defendant was wearing the backpack when Brewer searched it), and that the exigency of the situation permitted a warrantless search of the backpack.

In short, the undersigned agrees with the Government. In the absence of body camera footage or other real-time capture of events, the undersigned **FINDS** Brewer to be the more credible of the witnesses regarding the search of the backpack. Both witnesses acknowledged the passage of time since the events to which they testified, and how that could affect their memory.

---

[5] To be clear, Defendant does not challenge the warrantless search of his pockets incident to arrest. The search of his pockets yielded the methamphetamine, pipe, and currency, giving rise to Count One. Defendant's challenge is limited to the warrantless search of the backpack, the contents of which (firearm) give rise to Count Two.

But Brewer's version of events – that he handcuffed right Defendant right away, and that Defendant was wearing the backpack when Brewer searched it – is simply the more commonsense one.

Both witnesses testified that it was difficult to handcuff Defendant because of Defendant's bulky clothing and backpack. Defendant would have the Court believe that Brewer took a moment to have Defendant remove the coat and backpack before handcuffing him, and that Brewer would have comfort in taking such a moment because Defendant was compliant from being tased. But Brewer's version of the facts is more convincing. Per Brewer, he dealt with Defendant's bulk by simply utilizing two sets of handcuffs, linked together – a technique which does not appear to be uncommon or difficult, given the familiarity with which Brewer described it. And in the situation at hand, it makes sense that Brewer would handcuff Defendant quickly and gain control of a potentially dangerous scene. After all, Brewer pursued Defendant at extraordinarily high speeds, and the pursuit included country roads with dirt and gravel surface, where no safety-conscious person would maintain high speeds as Defendant attempted. Indeed, Defendant was driving so dangerously that he wrecked the motorcycle.

However, rather than that be the end of it, Defendant tried to elude Brewer on foot. This ultimately placed the two of them in a remote, wooded area. Here, Brewer was left to confront Defendant alone, one on one, at a distance of 100 yards or greater from his police vehicle. Defendant's size and strength understandably factored into Brewer's assessment of the situation and his actions in gaining control. Despite Defendant's testimony that he was, at this point subdued and compliant, Brewer would rightly worry that Defendant might continue to flee or otherwise create a danger. Thus, Brewer would have had every incentive to handcuff Defendant in the fashion

which Brewer described. As such, Defendant's claim that Brewer had him remove the backpack before handcuffing him, seems improbable.

Because the undersigned finds that Brewer's version of the handcuffing and arrest is the more credible, the undersigned necessarily concludes, then, that Brewer searched the backpack while Defendant still was wearing it. With Defendant still wearing the backpack during the search, the need for such a search is evident. Again, only moments before, Brewer was involved in a high speed pursuit of Defendant, and then a foot chase. He found himself alone in a remote, wooded area, with a large and strong detainee. As part of the pat-down of Defendant's clothing incident to arrest (the propriety of which Defendant does not challenge), and just prior to searching the backpack, Brewer had located a large bag of suspected methamphetamine, a pipe, and currency. Thus, Brewer was right to be concerned about drug activity and erratic, dangerous behavior. A search of the backpack, which Defendant still was wearing, is a natural extension of the pat-down of Defendant's clothes. Searching the backpack is like the search of a waist pack, purse, or other pouch or container closely held to the body which might hold weapons or other dangerous items. For Brewer to have not searched it, being part and parcel of Defendant's body, would be a strange oversight.

That Defendant was handcuffed and ostensibly unable to access the backpack and its contents is of no moment. Again, Brewer was alone, in the woods, with a physically strong and imposing detainee. Defendant's drug activity was evident from the pat-down of his clothes. Help came fairly quickly, but there was a period of time when it was just the two of them, moments after a high-speed chase and then a foot chase had concluded. Any period of time without backup would be concerning in these circumstances. Therefore, Brewer rightly may have been concerned about a number of possibilities relative to the backpack – for example, Defendant slipping the

handcuffs and accessing the backpack in a moment of distraction, or the backpack containing something dangerous to the both of them. Defendant's actions and decision-making up to that moment would have given Brewer no comfort about the safety of the backpack. Any reasonable officer in his position would want to know what its contents were and be assured of having total control of it. That Brewer indeed discovered a dangerous item – a firearm – only underscores the concern. The reason Defendant would want to have the firearm in the backpack is to have it close to his person. And it stands to reason, then, that if he wanted it close to his person, he was not adverse to using it.

The parties each argue the effect of Davis and Ferebee here. As for Davis, the facts are distinguishable from the instant case such that Davis does not dictate a favorable result for Defendant here. In Davis, the Fourth Circuit certainly concluded that the warrantless search of a backpack was unlawful. And Davis likewise involved the search of a backpack after a high-speed vehicular chase that turned into a pursuit on foot. However, in Davis, the arrestee (Davis) eventually "ran on foot into a swamp, and got stuck in knee-high water." Davis, 997 F.3d at 194. Davis carried a backpack into the swamp. However, with an officer pointing his service weapon at him and ordering Davis out of the swamp, "Davis complied by returning to dry land, dropping the backpack, and lying down on his stomach." Id. The officer patted down Davis, handcuffed him, and arrested him. Only afterwards did the officer search the backpack. What is more, three officers were involved in those events.

Davis is easily distinguishable from the instant matter, in that Defendant herein was wearing the backpack at the time it was searched. Unlike in Davis, the backpack herein was essentially part of Defendant's person at the time of arrest. The concern for officer safety is especially evident in the instant matter, as compared to Davis – where the arrestee was subdued,

16

the scene was secured, multiple officers were present, and the arrestee was not wearing the backpack at the time it was searched. Again, in the instant matter, concerns about officer safety were manifest. If ever there was a fact pattern in which search of a backpack incident to arrest should be permitted, it is the one herein.

As for Ferebee, its bearing on these facts is somewhat doubtful. Certainly, in that case, the Fourth Circuit rejected a challenge to the warrantless search of a backpack. But in Ferebee, the facts involved the warrantless search of a home, which was authorized per the terms of probation of the person whom Ferebee, the arrestee, was visiting. Ferebee, 957 F.3d, at 410. During the search of the home, an officer noticed a backpack and asked Ferebee about it. Id. Ferebee denied owning the backpack. Id. Ferebee was arrested for marijuana possession. Id. Once Ferebee was removed from the residence, an officer conducted a warrantless search of the backpack, finding a firearm, drugs, and drug paraphernalia. Id., at 411. Later, at the police station, Ferebee then claimed that the backpack was his. Id. Ferebee eventually was charged for impermissible possession of the firearm as a convicted felon. Id.

The Fourth Circuit upheld Ferebee's conviction because (a) he disclaimed ownership of the backpack, and (b) the search was incident to arrest. Id. But Ferebee does not necessarily inform the undersigned's analysis in the instant matter, because here, abandonment of the backpack is not at issue. Also, unlike in Ferebee, the undersigned has found that Defendant in the instant matter was wearing the backpack during the search. Thus, the undersigned accords Ferebee little weight in the analysis here.

At bottom, the undersigned **FINDS** and **CONCLUDES** that Brewer's testimony is credible and that the warrantless search of Defendant's backpack was permissible under applicable law, as applied to the facts of the case.

## IV. CONCLUSION

Accordingly, the undersigned **FINDS** that the Government has met its burden, by a preponderance of the evidence, to show the admissibility of evidence seized without a warrant. Thus, for the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Physical Evidence [ECF No. 20] be **DENIED.**

Any party shall have fourteen (14) days (filing of objections) from service of this Report and Recommendation to file with the Clerk of the Court **specific written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.** A copy of such objections should also be submitted to the presiding United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted March 25, 2024.

_____
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE